IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:09-cr-155-06 |
| -vs- | ) | |
| | ) | |
| Casey Mae Peterson, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:09-cr-89-01 |
| | ) | |
| -vs- | ) | |
| | ) | |
| Rapheal Jamell Murphy, a/k/a BD, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON APPLICABILITY OF FAIR SENTENCING ACT OF 2010

Before the Court is Defendant Casey Mae Peterson's Motion for Application of the Fair Sentencing Act of 2010 (Doc. #424).  Defendant Rapheal Jamell Murphy, also indicted on a crack cocaine offense, filed a sentencing memorandum seeking application of the Fair Sentencing Act of 2010 in his case (Doc. #167).  Both parties participated in the motion hearing on February 9, 2011.  The Court, having carefully considered the briefs and arguments of the parties, now issues this memorandum opinion and order.

## SUMMARY OF DECISION

In reviewing all of the introduced bills and the transcripts of the hearings regarding enactment of the Fair Sentencing Act of 2010, it is obvious to the Court that the statute was

enacted as the product of a series of compromises - compromises that were apparently necessary to obtain bipartisan support of the bill.  Under the circumstances and with all due respect to the contrary view, it simply strains reason to conclude that Congress intended by implication - fair, necessary, or otherwise - to apply the FSA retroactively in cases where the offense pre-dates enactment, but sentencing occurs afterwards.  Peterson's motion for application of the FSA (Doc. #424) is **DENIED**.  Murphy's request in his sentencing memorandum (Doc. #167) for application of the FSA is also **DENIED**.

## FACTUAL BACKGROUND

### 1. Casey Mae Peterson

The Grand Jury indicted Peterson for conspiracy to possess with intent to distribute and distribute in excess of 50 grams of cocaine base, in excess of 500 grams of a mixture and substance containing a detectable amount of cocaine, and marijuana.  The indictment details events occurring from January 1, 2008 to December 10, 2009.

On April 26, 2010, Peterson pled guilty to the charge, admitting to participation in a drug trafficking conspiracy in which it was reasonably foreseeable that more than 150 grams, but less than 500 grams of cocaine base was involved.  The plea agreement and the Court advised Peterson that she faced a mandatory life sentence due to two previous drug-related convictions certified by the government.  Since that time, Congress has increased the crack quantity required to trigger the minimum mandatory life sentence from 50 grams to 280 grams.  Peterson has not contested her admission to participation in a drug trafficking conspiracy in which it was reasonably foreseeable that the conspiracy involved between 150 grams and 500 grams of crack.  Peterson's sentencing is set for March 7, 2011.

### 2. Rapheal Jamell Murphy

On August 19, 2009, the Grand Jury indicted Rapheal Jamell Murphy on one count of conspiracy to possess with intent to distribute and distribute in excess of five grams of cocaine base and four counts of distribution of cocaine base. The indictment details events occurring from November 2007 through March 2009.

Murphy appeared before the Court for a change of plea hearing on August 3, 2010. Murphy pled guilty to one count of distribution of cocaine base. Pursuant to a written plea agreement, the United States agreed to withdraw certification of one of two prior felony drug convictions. The Court advised Murphy he faced a statutory mandatory minimum sentence of five years imprisonment. Murphy's sentencing is scheduled for March 3, 2011.

On February 2, 2011, the Eighth Circuit, overruling precedent, decided that only drug quantities involved in the count of conviction can trigger a mandatory minimum sentence for a discrete violation of 21 U.S.C. § 841(a). United States v. Resinos, - - F.3d - -, 2011 WL 309620, at *2 (8th Cir. 2011). In other words, a court can no longer aggregate the weight of controlled substances from dismissed counts as relevant conduct when determining applicability of mandatory minimum sentences. Murphy has pled guilty to a single count of distribution of 2.53 grams of cocaine base. The applicability of the FSA is of little significance in Murphy's case given the Eighth Circuit's recent decision in Resinos.

### ISSUE

The narrow issue before the Court is whether the Fair Sentencing Act of 2010 (hereafter "FSA") applies to defendants who were convicted before the statute was enacted, but are sentenced afterwards. Neither Peterson nor Murphy are asking this Court to retroactively apply

the FSA to a sentence imposed prior to its enactment, but are instead requesting the Court apply the version of 21 U.S.C. § 841(b)(1) in effect on the date of their upcoming sentencing hearing.

## DISCUSSION

In order to fully analyze the issue, a comprehensive review of the legislative history leading to the FSA's enactment is helpful.

### 1.     Legislative History of the FSA

Congress has struggled with how to treat cocaine base (crack) since it hit the streets in the early 1980's. When enacting the Anti-Drug Abuse Act of 1986 (hereafter "the 1986 Act"), Congress believed crack was much more dangerous than powder cocaine in that:

> (1) crack was highly addictive; (2) crack users and dealers were more likely to be violent than users and dealers of other drugs; (3) crack was more harmful to users than powder, particularly for children who had been exposed to their mothers' drug use during pregnancy; (4) crack use was especially prevalent among teenagers; and (5) crack's potency and low cost were making it increasingly popular.

Kimbrough v. United States, 552 U.S. 85, 95-96 (2007). At the time, crack was considered to be a scourge in the community. In order to protect the public, Congress adopted a 100:1 ratio, treating one gram of crack cocaine as the equivalent of 100 grams of powder cocaine. 21 U.S.C. § 841(b)(1)(A) (1986). The 1986 Act mandated that a person convicted of possession of 5 grams or more of crack be sentenced to a minimum of five years in prison and no more than 40 years. Id. A person possessing 50 grams or more of crack must be sentenced to a minimum term of 10 years in prison and may be sentenced to life. Id. In setting the offense levels for crack and powder cocaine, the Sentencing Commission also adopted the 100:1 ratio. U.S.S.G. § 2D1.1(c) (setting base offense levels ranging from 12 for offenses involving less than 250 milligrams of crack or 25 grams of powder to 38 for offenses involving more than 1.5 kilograms of crack or

4

150 kilograms of powder).

In 1986, Congress believed the harsher sentences for crack offenses would help control a "crack epidemic" that was ravaging communities. 155 Cong. Rec. S10488-01 (Oct. 15, 2009) (statements on introduced bills and joint resolutions). Over the next 20 years, each one of the bases relied on to support the harsher penalties was belied by time and additional research.

The Sentencing Commission prepared four reports for Congress on the subject of the 100:1 ratio - "the crack-powder disparity." The reports contain a common theme - that is, the 100:1 ratio was premised on erroneous assumptions resulting in significant sentencing disparities that overwhelmingly effected blacks. Worthy of note, the Sentencing Commission found as follows: (1) empirical data did not support the assumption that crack was more harmful than cocaine in terms of drug trafficking related violence, prenatal effects, and use among youth; (2) the large ratio resulted in the imposition of lower sentences for major drug traffickers dealing powder cocaine when compared to low-level crack dealers; and (3) the large ratio had a disproportionate effect on blacks, as blacks account for over 80 percent of defendants convicted in federal court of crack offenses. United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy (May 2007, May 2002, April 1997, February 1995). Following these findings, the Sentencing Commission repeatedly urged Congress to reduce the 100:1 ratio prescribed in the 1986 Act. Kimbrough, 552 U.S. at 99 (in 1995 the Commission proposed amendments to replace the 100:1 ratio with a 1:1 ratio, in 1997 proposed a 5:1 ratio, and in 2002 recommended lowering the ratio to no greater than 20:1). The multiple attempts to reduce the crack-powder disparity failed until last year.

During the 111th Congress, multiple bills were introduced in the House to address federal

sentencing disparities for distribution of crack and powder cocaine, including:

> H.R. 18 - "the Powder-Crack Cocaine Penalty Equalization Act of 2009" introduced on January 6, 2009 by Congressman Roscoe Bartlett;
>
> H.R. 265 - "the Drug Sentencing Reform and Kingpin Trafficking Act of 2009" introduced on January 7, 2009 by Congresswoman Sheila Jackson-Lee;
>
> H.R. 1459 - "the Fairness in Cocaine Sentencing Act of 2009" introduced on March 12, 2009 by Congressman Robert C. "Bobby" Scott;
>
> H.R. 1466 - "the Major Drug Trafficking Prosecution Act of 2009" introduced on March 12, 2009 by Congresswoman Maxine Waters;
>
> H.R. 2178 - "the Crack Cocaine Equitable Sentencing Act of 2009" introduced on April 29, 2009 by Congressman Charles Rangel; and
>
> H.R. 3245 - "the Fairness in Cocaine Sentencing Act of 2009" introduced on July 16, 2009 by Congressman Robert C. "Bobby" Scott.

These bills sought to either eliminate the increased penalties for crack cocaine offenses, eliminate mandatory minimum penalties for some crack cocaine offenses, increase the amount of crack cocaine required for imposition of the mandatory minimum term of imprisonment, or some combination thereof. Only one bill contemplated an effective date. H.R. 265, introduced by Congresswoman Jackson-Lee, sought to eliminate the crack and powder cocaine sentencing disparities and eliminate the mandatory minimum sentence for simple possession for "any offense committed on or after 180 days after the date of enactment." The bill also specifically provided that "[t]here shall be no retroactive application of any portion of [the amendments]." Further, the bill directed the Sentencing Commission to review and amend, if appropriate, the sentencing guidelines pertaining to crack offenses. Although the bill was referred to two

subcommittees, it was never reported out.

On May 21, 2009, the Subcommittee on Crime, Terrorism and Homeland Security of the Committee on the Judiciary House of Representatives held a hearing to discuss the five bills that had been introduced. <u>Unfairness in Federal Cocaine Sentencing: Is it Time to Crack the 100 to 1 Disparity?</u>, Hearing before the Subcommittee on Crime, Terrorism and Homeland Secruity, 111th Cong. 1 (2009). Elimination of the crack-powder disparity not only concerned fairness in sentencing, but also would remedy the underlying racial discriminatory impact the sentencing scheme had on blacks. <u>Id.</u> at 10-11 (statement from Congresswoman Jackson-Lee). In reviewing the testimony from sponsors of the various bills and witnesses, it is obvious that there was a consensus that amendments should be made, but there was no consensus as to what changes should be made. Congresswoman Jackson-Lee noted that her proposed bill was being reviewed to eliminate the provision regarding retroactivity. <u>Id.</u> at p. 18.

Of the six bills introduced in the House, only H.R. 3245, the Fairness in Cocaine Sentencing Act of 2009, passed out of the Subcommittee (House Energy and Commerce Committee). This bill sought to repeal the increased penalties for crack cocaine offenses, including the mandatory minimum five-year prison sentence for simple possession of crack. The legislation passed on a voice vote on July 23, 2009. H.R. Rep. No. 111-712 (Jan. 3, 2011). Six days later, on July 29, 2009, the Full Judiciary Committee voted 16-9 to pass the bill. <u>Id.</u>

Meanwhile, the Senate was also extensively discussing issues pertaining to the crack-powder disparity created by the 1986 Act. On April 29, 2009, the Subcommittee on Crime and Drugs of the Senate Judiciary Committee held its second hearing of the 111th Congress. The subject of the hearing was "Restoring Fairness to the Federal Sentencing: Addressing the Crack-

Powder Disparity." Senators, judges, and other witnesses spoke about the necessity of addressing the crack-powder disparity. Chairman Dick Durbin referred to the legislation creating the disparity as "our failed drug policy." <u>Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity</u>, Hearing before the Subcommittee on Crime and Drugs, 111th Cong. 2 (2009). John Timoney, Chief of Police of the Miami Police Department, testified that from a law enforcement's perspective, the disparity defies logic and the legislation's effects have been "unmitigated disaster." <u>Id.</u> at p. 25.

There was a general consensus from those testifying at the hearing that the 1986 Act ought to be amended. Lanny Breuer, Assistant Attorney General, Criminal Division, United States Department of Justice, testified that it was the D.O.J.'s position that federal sentencing laws should be reassessed with the goal to completely eliminate the disparity. <u>Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity</u>, Hearing before the Subcommittee on Crime and Drugs, 111th Cong. 5-6 (2009). Judge Reggie Walton, speaking on behalf of the United States Judicial Conference, noted the devastating impact the disparity has had on the black community. He stated the Judicial Conference's position was that "fundamental fairness" required that the disparity be addressed. <u>Id.</u> at p. 8. Likewise, Judge Ricardo Hinojosa, then Acting Chair of the United States Sentencing Commission, speaking on behalf of the Sentencing Commission, noted the Sentencing Commission remained committed in its belief there is no justification for the crack-powder disparity and recommended the ratio be reduced to no greater than 20-to-1, that the mandatory minimum threshold quantities for crack offenses be increased, and the mandatory minimum penalty for simple possession be repealed. <u>Id.</u> at p. 10.

While the subcommittee members and witnesses testifying at the hearing generally agreed that the crack-powder ratio ought to be amended, they expressed differing opinions as to who should benefit from an amendment. Senator Dianne Feinstein opined that the crack-powder disparity cannot be eliminated without addressing those that have been already unfairly sentenced. Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity, Hearing before the Subcommittee on Crime and Drugs, 111th Cong.16 (2009). Likewise, Asa Hutchinson, former United States Attorney for the Western District of Arkansas, former Congressman, and former Administrator of the Drug Enforcement Administration, opined that any changes would "need" to be made retroactive. Id. at p. 27. The Judicial Conference, on the other hand, while not adamantly opposed to making the changes retroactive, expressed concerned about the financial costs to the courts if the changes were to be applied retroactively. Id. at p. 21

At the time of the hearing in April 2009, the Department of Justice did not take a firm position on retroactivity because it did not want to "disenfranchise" those that the D.O.J. was trying to "bring into the process." The D.O.J. intended to "defer to the judges on implementation" with the view that retroactivity would be applied case by case. Id. at p. 20. Senator Amy Klobuchar expressed concern about "decriminalizing" crack offenses and opposed reducing sentences in those cases where other charges may have been dropped because the sentence prescribed for the crack offense was deemed sufficient. Id. at pp. 20-22. Senator Klobouchar suggested that "we move very carefully as we look at any talk of retroactivity." Id. at p. 22.     On October 15, 2009, Senator Dick Durbin introduced S. 1789, "the Fair Sentencing Act of 2009". This bill sought, in relevant part, to completely eliminate the crack-

powder disparity, eliminate the mandatory minimum sentence for simple possession, increase the penalties for "major drug traffickers," and enhance the penalties for acts of violence while drug trafficking. It did not contain an effective date or otherwise address the issue of retroactivity. Nevertheless, the bill's clearly enunciated purpose was to eliminate the 100:1 crack-powder ratio that senators now realized lacked an evidentiary basis, and to remedy the racially discriminatory impact of the statute. 155 Cong. Rec. S10488-01, 2009 WL 3319524 (Oct. 15, 2009) (statements on introduced bills and joint resolutions). The bill as initially proposed did not pass.

The bill was amended to reduce the crack-powder ratio from 100:1 to 18:1. 156 Cong. Rec. S1681 (Mar. 17, 2010). The amendment did not satisfy those seeking to eliminate the disparity, but was considered "a start." For instance, Wade Henderson, president of The Leadership Conference on Civil and Human Rights, issued a statement expressing disappointment that the disparity was not eliminated, but calling the legislation a "step forward." Id. Chairman of the Senate Judiciary Committee Patrick Leahy joined in the passage of the amended legislation, but noted:

> The racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution's promise of equal treatment for all Americans. Although this bill is not perfect, its passage marks a significant step forward in making our drug laws fairer and more rational. Despite my belief that parity was the better policy, I have joined with Senator Durbin and support the progress represented by his compromise with Senator Sessions. It reduces the disparities that leave some in jail for years while their more privileged counterparts go home after relatively brief sentences. Today, that compromise means we are one step closer to fixing this decades-old injustice. I commend Senators Durbin, Sessions, Graham, Coburn, and Hatch for negotiating the compromise that allowed this important piece of legislation to pass the Senate Judiciary Committee by a unanimous vote. As chairman, I was able to report on behalf of the Senate Judiciary Committee the first measure we have ever been able to approve that begins to undo the unjust sentencing disparity.
> * * *
> After more than 20 years, the Senate has finally acted on legislation to correct the

>crack-powder disparity and the harm to public confidence in our justice system it created. Although this bill is not perfect and it is not the bill we introduced in order to correct these inequalities, I believe the Fair Sentencing Act moves us one step closer to reaching the important goal of equal justice for all.

Id. at S1682. Congressman Scott noted the bill was a bipartisan compromise negotiated and drafted by Democratic and Republican members of the Senate Judiciary Committee. 156 Cong. Rec. 6197, 2010 WL 2942883 (July 28, 2010. Congressman James Clayburn expressed disappointment that the legislation did not completely eliminate the disparity, but commended the work of those negotiating the compromise. Id. at H6198. Congressman Daniel Lungren stated that he could not support legislation to completely eliminate any disparity, but supported the amended bill as "tough but fair." Id. at H6202. However, he would not support going any further. Id. As amended, he believed the bill was "a good compromise." It serves the ends of justice and fairness." Id. Congressman Paul supported the legislation, although reluctantly, because he was optimistic that the overall effect would be positive. Id. at H6203.

On March 17, 2010, after the amendment and a third reading, the Senate passed the bill by unanimous consent  The amended bill passed the House on July 28, 2010. President Barack Obama signed it into law on August 3, 2010.

### 2. Impact of the FSA in this Case

Senate Bill 1789, now commonly referred to as the FSA, reduced penalties for crack cocaine offenses. Under the statutory amendment to 21 U.S.C. § 841(b)(1)(B)(iii), the amount of crack necessary to trigger a mandatory minium term of imprisonment of ten years increased from 50 grams to 280 grams, and the amount necessary to trigger a five year mandatory minimum has been increased from five grams to 28 grams. While the amendments, in part, increased the

quantities of crack needed to trigger the mandatory minimum, it did not change the provision that mandates a mandatory life sentence for an defendant who possesses the threshold quantity of crack and who has two prior felony drug convictions.

Peterson has two prior felony drug convictions and is thus facing a mandatory life sentence. Murphy has pled guilty to a discrete incident involving 2.53 grams of crack which, in light of the Eighth Circuit's recent guidance in United States v. Resinos, - - F.3d - -, 2011 WL 309620, at *2 (8th Cir. 2011) on calculating quantities for discrete distribution charges, is insufficient to trigger a mandatory minimum sentence under either the old or new law.

### 3. Retroactivity of the FSA

Peterson and Murphy ask this Court to apply the reduced penalties contained in the FSA when imposing their sentence. In support of their positions, Peterson and Murphy rely heavily on United States District Court Judge D. Brock Hornby's decision in United States v. Douglas, - - F.Supp.2d - -, 2010 WL 4260221 (D. Me. Oct. 27, 2010). The United States opposes application of the FSA in these cases, relying on the so-called general savings statute contained in § 109, United States Code, Title 1 (Doc. #437, United States' Sentencing Memorandum in Peterson's case at p. 3; Doc. #177, United State's Response to Sentencing Memorandum in Murphy's case at pp. 2-5). The United States contends the general savings statute requires this Court to apply the criminal statute in effect at the time of a defendant's offense unless Congress expressly provides otherwise.

The Court begins its analysis with the plain language of the FSA. The FSA contains no express provision on the issue of retroactivity. It does not identify any categories of offenders to whom the changes created by the FSA apply, i.e. those who have not yet offended, offenders not

yet convicted, offenders convicted but not yet sentenced, or offenders already sentenced. The Eighth Circuit, however, has concluded certain categories of defendants are not entitled to the benefit of the changes. United States v. Smith, - - F.3d - -, 2011 WL 285056, at **3-4 (8th Cir. Jan. 31, 2011) (the FSA does not apply to cases pending on appeal after the FSA was enacted); United States v. Williams, - - F.3d - - , 2011 WL 167073, at *1 (8th Cir. Jan. 20, 2011) (the FSA does not apply retroactively to defendants that were sentenced before enactment of the FSA). Other circuits have also refused to apply the more lenient mandatory minimum sentences of the FSA to defendants who were sentenced before the enactment. See, e.g., United States v. Doggins, - - F.3d - - , 2011 WL 438935, at *4 (5th Cir. 2001); United States v. Diaz, 627 F.3d 930, 931 (2d Cir. 2010); United States v. Bell, 624 F.3d 803, 814 (7th Cir. 2010); United States v. Gomes, 621 F.3d 1343, 1346 (11th Cir. 2010); United States v. Carradine, 621 F.3d 575, 579-81 (6th Cir. 2010).

The issue of whether the FSA applies to defendants convicted but not yet sentenced when the FSA was enacted is one of first impression in this Court. It remains an open question in each of the circuit courts as well. Other district courts in the Eighth Circuit have reached different decisions. Compare United States v. Byars, No. 8:10CR50, 2011 WL 344603, **8-9 (D. Neb. Feb. 1, 2011) (finding the FSA applies to defendants who pled guilty before enactment of the FSA, but sentenced afterwards); United States v. Holland, No. 8:10CR48, 2011 WL 98313, at *11 (D. Neb. Jan. 10, 2011) ("It is a necessary or fair implication from the urgency reflected in the grant of emergency authority that Congress intended the FSA penalties and concomitant Guidelines base offense level adjustments to apply to pending cases."); United States v. English, - - F.Supp.2d - -, 2010 WL 5397288, at **2-3 (S.D. Iowa Dec. 30, 2010) (explaining that

13

because there is neither an express nor necessary implication contained within the FSA, the general savings statute applies), with United States v. Watson, 8:10-cr-49-LSC (D. Neb. 2010) (applying the pre-FSA penalties when imposing a sentence after enactment of the FSA), appeal docketed, No. 10-3059 (8th Cir. Sept. 17, 2010).

In light of the lack of express congressional intent and the state of flux of the case law on this issue, the Court begins with its own analysis of whether the general savings statute applies. The general saving statute, 1 U.S.C. § 109 provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

It was enacted to overcome the common law rule that the "repeal of a criminal statute or its reenactment with reduced penalties abated a prosecution that had not reached final disposition in the highest court authorized to review the conviction and sentence." United States v. Smith, - - F.3d - -, 2011 WL 285056, at *3. In enacting 1 U.S.C. § 109, Congress specifically sought to ameliorate the unintended consequence of abatement inherent in amendments to penalty clauses. It is considered a rule of statutory construction that prescribes the effect of a repealing statute on an existing penalty in the absence of congressional intent to the contrary. Martin v. United States, 989 F.2d 271, 276 (8th Cir. 1993).

The United States' approach in this case is simple: the omission of "express" language

regarding retroactivity is the end of the statutory construction exercise. Its argument relies on the savings statute's provision that the repealing act "shall so expressly provide" that a previously harsher penalty is to be released or extinguished. The government's argument, however, ignores United States Supreme Court precedent explaining the savings clause cannot be applied in certain circumstances. The savings statute "cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication." Great N. Ry, Co., 208 U.S. 452, 465 (1908).[1] In other words, the savings statute does not apply in instances where, by "necessary implication, arising from the terms of the law as a whole," it is clear "the legislative mind will be set at naught by giving effect to the [savings statute]." Id.

Here, Peterson and Murphy argue that Congress by "necessary implication" intended the reduced penalties of the FSA to apply to defendants who, even though they committed their crimes before the statute's enactment, are not sentenced until after the enactment date. The argument creates a distinction between two classes of retroactivity - defendants convicted and sentenced before August 3, 2010 , and defendants convicted before August 3, 2010 but sentenced after August 3, 2010. The leading case lending support to the defendants' argument comes from the Honorable D. Brock Hornby in United States v. Douglas, - - F. Supp. 2d - -, 2010 WL 4260221 (D. Me. Oct. 27, 2010). A number of courts have followed Judge Hornby's analysis. See, e.g., United States v. Robinson, - - F.Supp. - - , 2011 WL 379536 (E.D. Tenn. Feb. 4, 2011);

---

[1] In a subsequent case, the Supreme Court, in a footnote, described the Great Northern standard as applying to congressional will manifested "by fair implication or expressly." Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653, 659 n. 10 (1974). Based on the Court's findings, it is unnecessary to resolve in this case whether the will of Congress must be shown by "necessary implication" or "fair implication" or whether the Supreme Court intended to modify the Great Northern standard.

United States v. English, - - F.Supp.2d - -, 2010 WL 5397288 (S.D. Iowa Dec. 30, 2010); United States v. Gillam, - - F.Supp.2d - - ,2010 WL 4906283 (W.D. Mich. Dec. 3, 2010); United States v. Whitfield, No. 2:10CR13, 2010 WL 5387701 (N.D. Miss. Dec. 21, 2010); United States v. White, 6:10-cr-247-GRA, 2011 WL 587100 (D.S.C. Feb. 9, 2011).   In summary, Judge Hornby reasoned that the context in which the FSA was passed, its preamble, and most importantly the "emergency" mandate that the Sentencing Guidelines be amended to achieve consistency with applicable law, give rise by necessary implication the conclusion that Congress intended the FSA to apply to all offenders sentenced after its enactment.  Douglas 2010 WL 4260221, at **4-5.

In addition to Judge Hornby's decision, there are two other pieces of "evidence" relied on by courts finding the FSA applies to the class of defendants at issue in this case.  The FSA's lead sponsors, Senators Durbin and Leahy, authored a letter dated November 17, 2010, to Attorney General Eric Holder.  In the letter, the senators "wholeheartedly agree" with Judge Hornby's opinion in Douglas and urge General Holder to apply the FSA's modified mandatory minimums to all defendants who are sentenced after the enactment date of the FSA.  Another source courts have found persuasive is Law Professor Douglas A. Berman's Sentencing Law and Policy blog wherein he opines that the United States Supreme Court's decision in Abott v. United States, - - U.S. - -, 131 S.Ct. 18 (2010) provides support for application of the FSA to all pending cases.  United States v. Gillam, - - F.Supp.2d - -, 2010 WL 4906283, at *6 (W.D. Mich. Dec. 3, 2010).

The Court has carefully considered the analysis and reasoning contained in all of the opinions it found on the issue.  It also considered the various sources courts have found persuasive when determining the FSA is to be retroactively applied.  Notably, the FSA consists of almost 1,300 words - the word "retroactive" is not among them.  In finding the revised

16

mandatory minimums apply to conduct pre-dating the FSA, Judge Hornby relies on three words in the statute, "conforming" and "achieve consistency," to do what Congress did not expressly do. The Supreme Court has explained that courts are to avoid reading "congressional intent into congressional inaction." Kimbrough, 552 U.S. at 106 (citing Bob Jones Univ. v. United States, 461 U.S. 574, 600 (1983)). Congress' inaction, particularly in light of the discussions regarding retroactivity before the FSA was passed, indicates the omission was intentional. In reviewing all of the introduced bills and the transcripts of the hearings, it is obvious to the Court that the FSA is the product of a series of compromises - compromises that were apparently necessary to obtain bipartisan support of the bill. Under the circumstances and with all due respect to the contrary view, it simply strains reason to conclude that Congress intended by implication - fair, necessary, or otherwise - to apply the FSA retroactively.

Moreover, the Court is unpersuaded that Congress' authorization and directive to the United States Sentencing Commission to enact emergency guideline amendments is direct evidence that Congress intended the FSA to apply to all sentences after the date of the enactment. It is one thing to direct, as the FSA does, that the discretionary Sentencing Guidelines be conformed and applied to a new regime, and another thing to infer from that mandate that Congress necessarily, or even fairly, intended that mandatory minimums, which are legislative dictates, be reduced retroactively in all sentences following the date of the new enactment. Nothing in the language of the FSA hints at, let alone necessitates, the inference. Likewise, the Court does not believe congressional intent can be inferred by Congress's demand for a five-year report from the Sentencing Commission discussing the impact of the FSA's changes.

Lastly, the Court is unconvinced that the asserted "limited" retroactivity at issue in this case finds support in the FSA's legislative history. Congress clearly considered the question of retroactivity when it considered amending the crack penalties. In the end, it chose to insert no language expressly addressing retroactivity, thus leaving the general savings statute as the default position. Its silence in the enacted legislation is telling. The discernible specific intent of the legislature, as a collective body, when passing the FSA was that it represented a series of deals and compromises. Provisions advocated by some congressional members included eliminating the crack-powder disparity altogether and applying the FSA retroactively. These items never made it into the final bill. While certain segments from the legislative history support the defendants' argument, a full review of the entirety of the history indicates retroactivity was an area of contention. The D.O.J. feared retroactivity could be an insurmountable burden, stating it did not want to "disenfranchise" the people they needed at the table to ensure passage. Congress chose to omit any reference to retroactivity when the issue was placed squarely before it. This Court's role is to give effect to what Congress actually did, and not what selected congressional members wanted, or what judges think Congress should have done. The Court finds the crack penalties found in 21 U.S.C. § 841(b) were not repealed by necessary or even fair implication when Congress enacted the FSA.

  **4.  Constitutional Challenges**

Murphy contends the imposition of the mandatory minimum sentence would violate Fifth Amendment equal protection and would constitute cruel and unusual punishment prohibited by the Eighth Amendment.

Murphy, relying on <u>Griffith v. Kentucky</u>, 479 U.S. 314 (1987), asserts it would be a

violation of his right to equal protection if the Court does not apply the FSA in his case (Doc. #167, Sentencing Memorandum, p. 18). The constitutional concern raised in Griffith was "the actual inequity that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary of a new rule." 479 U.S. at 323. The Supreme Court thus required courts to apply new constitutional rules of criminal procedure to all cases not yet final. Id. The Supreme Court did not suggest that similar constitutional concerns would apply to a new rule announced by Congress. United States v. Acoff, - - F.3d - - , 2011 WL 447043, at *1 (2d Cir. 2011).

Moreover, the Eighth Circuit has explained that legislatures often re-evaluate and change the substance of their penal statutes. It is not irrational to apply the changes prospectively. Thompson v. Missouri Bd. of Parole, 929 F.2d 396, 400 (8th Cir. 1991) (finding no equal protection violation when state revised its conditional release statute but did not apply the statute retroactively); see United States v. Acoff, - - F.3d - - , 2011 WL 447043, at *1 (2d Cir. 2011) ("It is not irrational for Congress to impose a penalty on those who committed their offenses at a time when they knew or should have known the severity of the applicable penalty, even while reducing the penalty as to future offenders."). Murphy's Fifth Amendment argument is foreclosed by Eighth Circuit precedent. Id.; United States v. McClellon, 578 F.3d 846, 861 (8th Cir. 2009) (rejecting argument that imposition of mandatory minimum sentence for crack offense violates due process or equal protection).

Murphy also asserts the FSA ought to apply in his case in order to avoid cruel and unusual punishment (Doc. #167, Sentencing Memorandum, p. 20). This argument has also been foreclosed by the Eighth Circuit. United States v. Williams, 2011 WL 167073, at *2 (8th Cir.

Jan. 20, 2011) (reaffirming previous decisions concluding that mandatory minimum penalties for drug offenses do not violate the Eighth Amendment and concluding that application of the mandatory minimum in effect before enactment of the FSA does not violate the Eighth Amendment).

## CONCLUSION

Upon exhaustive review of all of the evidence and arguments of the parties, the Court believes Congress intended the timing of the offense, not the timing of the sentencing to be controlling on the courts.  The Court also believes the Eighth Circuit will continue to follow its reasoning in United States v. Smith, - - F.3d - -, 2011 WL 285056 (8th Cir. Jan. 31, 2011), and conclude the FSA does not apply retroactively in any cases where the offense occurred before the FSA was signed into law.  Finally, the Eighth Circuit has rejected Murphy's Fifth and Eighth Amendment constitutional challenges and so does this Court.

For all of the foregoing reasons, the FSA is determined to be **not** retroactive.  Peterson and Murphy will be sentenced accordingly.

**IT IS SO ORDERED.**

Dated this 1st day of March, 2011.

*/s/   Ralph R. Erickson*
   Ralph R. Erickson, Chief Judge
   United States District Court